|172    461|
|179   ¹241|

## CHAMBERS v. CHESTER et al., Appellants.

### In Banc, March 4, 1903.

1. **Mining**: CHANGE IN GRADE OF POWDER: NOTICE: QUESTION FOR JURY. Plaintiff was injured by a premature explosion of giant powder with which he was charging a drill hole in a mine, and charged his injuries to the negligence of the operators in furnishing him, without notice, powder composed to the extent of forty per cent of nitroglycerine instead of twenty-seven per cent, the grade he had been using, the powder furnished being a much more explosive grade. He testified he had worked in the mine for six months and during all that time had used twenty-seven per cent powder except two days six or seven weeks prior to the accident and one day about two weeks prior thereto, when the miners had used forty per cent powder, but not liking it, had returned to the twenty-seven per cent grade; and that the higher the grade of powder the easier it is to explode, and that the force necessary to explode forty per cent and twenty-seven per cent powder would be about three to two. Other witnesses for him testified that the miners were not notified that a change was made in the powders, and that the powder being used at the time of the explosion was the forty per cent grade, but it was not shown that plaintiff knew that fact, although the sticks had labels on them showing their grade, but the evidence is conflicting as to whether those labels were plain and prominent enough to attract attention. *Held*, that it was a question of fact for the jury to decide whether plaintiff had notice of the change, and there being substantial evidence to support their finding it will not be disturbed.

2. ———: ———: MATERIALITY OF NOTICE. If plaintiff knew that the higher grade of powder explodes more easily than the lower grade, and knew that more care was necessary in using the higher grade to prevent an explosion, notice of the change from a lower to a higher grade of powder was material to him.

3. ———: CHANGE IN GRADE OF POWDER: PROBABILITY OF EXPLOSION. Evidence that plaintiff had used both the lower grade and higher grade of powder without injury when he knew what he was using, is itself, in the absence of any counter showing, a sufficient cir-

cumstance from which the jury was justified in deducing the fact that if plaintiff had known he was using the more dangerous agency he would have attempted to handle it with such care that the accident would not have occurred; and, hence, such facts are not set aside as mere conjecture, but are held to be evidence that the accident would not have occurred had he been using the less dangerous powder.

4. ———: ———: ———: RIGHT TO NOTICE. A miner is entitled to notice when a change is made in the powder furnished him from a less explosive grade to a more explosive one; especially is this true if on all previous occasions when a change was made to the more explosive kind, such notice was given.

5. ———: HAZARD. All persons engaged in a hazardous business owe a duty to all other persons so engaged, to be careful.

6. ———: ———: ASSUMPTION OF RISK. A miner in entering upon the hazardous business of using giant powder composed in part of nitroglycerine to loosen the ore, assumes all the risks that are ordinarily and necessarily incident to the business, but he does not assume to bear all the extraordinary and unusual risks that may be caused by the misconduct or negligence of the operator; for instance, if he is furnished a more explosive powder without notice, and uses it believing it to be the less explosive grade he has been using, he is not chargeable with the extra care which the use of the more explosive grade makes necessary. Especially should this be the rule if on all previous occasions the company had given notice of a change from a less to a more explosive agency.

7. Negligence: INSTRUCTIONS: AS A WHOLE: CURING DEFECTS. Verdicts should not be set aside for defects in plaintiff's instructions if the instructions as a whole correctly declare the law, nor if a defect in one of plaintiff's instructions is cured or supplied by an instruction on the same subject given for defendant.

8. Mining: INSTRUCTIONS: NOTICE OF EXPLOSIVES: ASSUMPTION OF FACT. The instructions for plaintiff set out in the opinion do not require the operators of a mine in which plaintiff was injured by a premature explosion of giant powder with which he was charging a drill hole, to have notified the plaintiff, irrespective of his knowledge or opportunity of knowing, that such powder was more explosive and dangerous than that he had been accustomed to use; nor do they assume that he was ignorant of the character of the powder, or that he was exercising ordinary care; nor was the case devoid of facts on which to rest such instructions; nor do they mistake the facts as shown by plaintiff's evidence; nor do they authorize a recovery by plaintiff notwith-

standing he knew of a change in the powder used if the foreman failed to notify him of its character; nor do they permit him to recover notwithstanding plaintiff was guilty of contributory negligence, but they are free from objections of this character.

·9. ———: EVIDENCE: ACCEPTED BY APPELLANT: WAIVER. Appellant must be held to have waived his objection to a ruling permitting plaintiff, in a suit for damages for personal injuries, to testify that he was a married man, by inviting such evidence himself and by not objecting to it when often repeated or spoken of.

Appeal from Jasper Circuit Court.—*Hon. Joseph D. Perkins,* Judge.

AFFIRMED.

*Percy Werner* for appellants; *Galen* and *A. E. Spencer* of counsel.

(1)  There is no evidence to support the verdict: (a) Notice of grade of powder, both general and special —by printed notice on each stick of powder supplied, was given.   (b) If not it was immaterial, as plaintiff does not pretend that he would have proceeded in any different manner than he did, or that he could have used any greater care than he did.   (c) There is no evidence that the same accident would not have occurred had plaintiff been using twenty-seven per cent nitroglycerine powder instead of forty per cent.   A verdict may not be based on mere conjecture.   Breen v. St. Louis Cooperage Co., 50 Mo. App. 212; Sorenson v. Paper & Pulp Co., 56 Wis. 338; Manning v. Ins. Co., 100 U. S. 693.   (d) The injury was one of the risks of the hazardous occupation in which he was engaged, which was assumed by plaintiff.   King v. Morgan, 109 Fed. 446.   (2)  Testimony that plaintiff was a married man was inadmissible.   Stephens v. Railroad, 96 Mo. 207; Daymarsh v. Railroad, 103 Mo. 570; Mahaney v. Railroad, 108 Mo. 191; Williams v. Railroad, 123 Mo. 573.   (3)  The first instruction given to jury on plaintiff's behalf is a tissue of errors: (a) It makes duty to inform plaintiff of increased

hazards absolute, irrespective of his knowledge or opportunity for knowledge. (b) It assumes a controverted fact, i. e., plaintiff's ignorance of grade of powder he was using and hazard thereof. Courts, in their charges, should not, directly or indirectly, assume any controverted fact, nor use equivocal phrases which may leave such an impression. 2 Am. and Eng. Ency. of Pl. and Pr., p. 116; Fullerton v. Fordyce, 121 Mo. 13; Hull v. St. Louis, 138 Mo. 625; Peck v. Ritchey, 66 Mo. 121; State v. Mason, 96 Mo. 599; Railroad v. Zang, 10 Ill. App. 594; Railroad v. Shelton, 66 Ill. 424; Railroad v. Bloomfield, 7 Ill. App. 211; Railroad v. Dixon, 49 Ill. App. 492; Martin v. Leslie, 93 Ill. App. 52; Clough v. Whitcomb, 105 Mass. 482. (c) It assumes that plaintiff was in the exercise of ordinary care and prudence. (d) It contains a clause which is absolutely meaningless and confusing. (e) It contains a misstatement of fact. (f) It is not predicated on the evidence. There was no evidence that the explosion occurred "on account of the use of the said higher grade of explosive." The findings of a jury must not rest on surmise or conjecture, but must be based on substantial legal evidence. McCarthy v. Fagan, 42 Mo. App. 625. (g) It submits issues to the finding of the jury about which there is no proof. There was no evidence that the explosion occurred on account of plaintiff's "want of knowledge of the high character of the explosive," or of the "increased degree of care required of him to prevent such explosion." (4) The second instruction, given on behalf of plaintiff, is likewise fatally erroneous in several respects: (a) It places the duty of conveying information to plaintiff, as a matter of law, on a particular agent of defendant. (b) It made this duty absolute, requiring more than ordinary care. (c) And irrespective of plaintiff's knowledge or opportunities for knowledge. (d) The failure to give notice is made, as a matter of law, to constitute negligence. (5) The third instruction, given on behalf of plaintiff, is erroneous. It authorizes a recovery on the finding, of

plaintiff's ignorance of the grade of powder he was using, notwithstanding that ignorance may have been due to his own negligence.

*Thomas & Hackney* for respondent.

(1)   The third instruction given for the plaintiff was proper.   It was defendants' duty to notify plaintiff of the substitution of the higher grade, and more dangerous explosive for the safer and less dangerous one; and plaintiff did not assume the increased risks attending the use of the newly-substituted and more dangerous explosive thus put into his hands without warning or knowledge on his part of its dangerous character.   Smith v. Oxford Iron Co., 42 N. J. L. 474. (2)   The controlling question presented by this appeal is whether the evidence was sufficient to justify the jury in drawing the inference that the substitution of the higher grade and more sensitive powder without notice or warning to plaintiff, and his handling of same in the same manner that he handled the low grade powder, believing it to be a less dangerous explosive, was the cause of the explosion.   It was the special province of the jury to say whether, from all the facts and circumstances in evidence, the injury was caused by the negligent acts and omissions of defendants. Twohey v. Fruin, 96 Mo. 104; Dunn v. Railroad, 21 Mo. App. 198; 1 Shearman & Redf. on Neg. (5 Ed.), secs. 54, 55, pp. 64, 67; 1 Thompson Com. on Neg., sec. 161.   "In applying the doctrine of proximate cause it is not necessary that the connection between the cause and the effect shall be proved beyond the possibility of doubt, or that such connection be cognizable by the senses.   It is sufficient if the evidence of the connection produce that moral conviction upon which men are accustomed to act in the important concerns of life, and it is only necessary that the jury be reasonably satisfied that the alleged cause was in fact the proximate cause of the effect complained of."   Buswell on Per.

Vol 172 mo—30.

Inj., sec. 98, p. 156. It is proper for the jury to infer a fact from the existence of other facts in evidence. Smith v. Tel. Co., 57 Mo. App. 266; Tanner v. Hughes, 53 Pa. St. 289; Wharton on Ev., sec. 1226; 1 Greenleaf on Ev. (Redf. Ed.), sec. 44; 16 Am. and Eng. Ency. Law (2 Ed.), p. 317.

MARSHALL, J.—The following opinion heretofore rendered in Division One of this court, is hereby adopted as the opinion of the Court in Banc. *Brace, Gantt, Burgess, Valliant* and *Fox, JJ.,* concur; *Robinson, C. J.,* dissents.

## In Division One.

This is an action for damages for personal injuries sustained by the plaintiff, while in the employ of the defendants, in their mine in Jasper county, known as the "Hawkeye Mine," caused by an explosion of nitroglycerine, which the plaintiff was loading in a hole that had been drilled in a rock wall, preparatory to blasting, and in consequence of which the plaintiff lost his eyesight. The petition contains three assignments of negligence, two of which the plaintiff offered no evidence to support and the court took them away from the jury, so that the case was tried solely upon the remaining charge which was as follows:

"Plaintiff further states, that he had, for a long time previous thereto, been in the employ of the defendants, and had been furnished by defendants, and had been using, giant powder with twenty-seven per cent only of nitroglycerine; that on the said March 20, 1899, the defendants had carelessly and negligently furnished plaintiff with giant powder containing forty per cent of nitroglycerine, without notifying or in anywise informing plaintiff and those employed with him in the mine of the change of powder. Plaintiff states, that the powder containing forty per cent of nitroglycerine, is much more easily exploded and will ex-

plode with much less force than powder containing only twenty-seven per cent, and requires a higher degree of care in the handling, lest the same prematurely explode, and powder containing forty per cent of nitroglycerine is therefore rarely used in the mines; that plaintiff, not knowing the dangerous character of the explosive furnished by the defendants for the charging of said drill hole, and believing that he was charging the same with giant powder containing only twenty-seven per cent of nitroglycerine, and exercising due care, and while using the said iron bar, and was with due care pushing the sticks of powder into place, in said drill hole with said iron bar, in the manner that he had been accustomed to do while using powder containing only twenty-seven per cent of nitroglycerine, the said giant powder, owing to its high explosive character as aforesaid, through the negligence and carelessness of defendants in not notifying plaintiff of the high grade of said explosive and of the necessity of greater care in its use, exploded while plaintiff was engaged in loading said drill hole, by which explosion, by means of the powder, and the pieces of gravel and rock which were thrown into plaintiff's face and eyes, plaintiff was seriously injured and wounded, and his eyesight of both eyes totally destroyed.''

The answer is a general denial, with special pleas of assumption of risk and contributory negligence. There was a verdict for the plaintiff for five thousand dollars and the defendants appealed.

Three principal errors are assigned: first, refusal of the court to direct a verdict for the defendants at the close of the plaintiff's case; second, admission of incompetent evidence, to-wit, that the plaintiff was a married man; and, third, erroneous instructions given for the plaintiff.

The first assignment of errors necessitates a full statement of the evidence, and for this purpose the abstract of the evidence for the plaintiff, made by counsel for the defendants, is adopted. It is as follows:

Abstract of the Evidence.

"Plaintiff testified that he was forty-four years of age (over the objection of defendant that he was married); that he had been working in mines for the last few years, for the defendants about six months before he was injured; was earning $2.25 per day; that Mr. Sutton was the ground foreman, that he was engaged in cutting, i. e., drilling, exploding and shooting, in flint ground, flint and jack; that he had been using twenty-seven per cent giant powder ever since he had been working there with the exception of a day or two; on the day in question was working under directions of Mr. Sutton, who told him he wanted us to load a hole and shoot it before noon, he did not specify the amount of powder; the hole was five or six feet deep, in smooth solid and flint rock, and in loading our hole we wanted to get in a good shot and we concluded we would take off part of the wrapper, that is what we call skinning it, we tore off the wrapper until we came to the bottom wrapper, and pushed the powder then with one thin wrapper on the powder around it, and put them in the hole and took the tamping bar and slid this down to the back, the hole was almost horizontal; and when we got in quite a little powder and were getting the hole pretty well loaded one stick seemed to hang on the side of the hole. Mr. Pearson, my buddy, unwrapped the powder and tore off the extra paper we did not want to use, and handed me the powder. I was pushing that one stick which seemed to hang, as carefully as I could, when the explosion occurred; was not informed what grade of powder was furnished me, I knew of no change, I supposed we were using twenty-seven per cent, we had been using it ever since I worked for them with the exception of a day or two. One time, six or seven weeks before this happened, when George Bartholomew was ground boss, they sent down a higher grade of powder two days, but we did not like it, and we went back to the twenty-seven per cent powder; but after Mr. Sutton came, a week or so,

he brought down two or three boxes of a higher grade of powder of the same brand, forty per cent as he stated, and he said he wanted us to test it, this was two weeks before I got hurt, and we used it one day, and went back to the low grade powder.   The accident happened March 20th; my face was shot into a kind of jelly, it has gotten well, but I have never got so I could see any since.   I suffered for three or four months, and do yet.   Was in bed five or six weeks.

"Cross-examination:   Mr. Sutton simply told us to load and shoot the hole, we used our own discretion about the number of sticks we put in, and the way we should load the hole; I used the ordinary tamping rod or gas pipe with a wooden plug in the end; the hole was about two inches at the start and ran back to perhaps one and one-half inches; it went back about four feet, and then ran back into the pocket; the stick of powder was seven-eighths of an inch in diameter; we took all the paper off but the last strip so it would not fill up the pocket so fast; the powder is easier to break than where it remains on; we did this until we got a number of sticks in, and the last I put in stuck on the side of the smooth hole and broke.   The powder is nitroglycerine; it is gummy, so in pushing the sticks in the pocket it left some sticking to the side of the hole; I wanted to clean it off and in order to get it off I put the end of my bar against it, where I could feel the powder and pushed, was just careful where the powder was sticking on the side of the hole; did it two or three times; I suppose I put the bar against the top or bottom of the hole.   Do not know how much pressure I put on; not very much, I simply pushed; did not strike; that necessarily put the outside of the iron of the gas pipe against the gummed powder. Just about that time they called dinner; the explosion occurred about two minutes later.   Have always understood high grade powder was easier exploded.   You can explode powder with a blow.   I remember Mr. Spencer coming to my house after the accident and

signing a statement which was read to me. I don't know what was in it. I did not say that we were using forty per cent powder, and that it was all right to use.

"Re-Direct: I think the force necessary to explode powder containing twenty-seven per cent glycerine and that containing forty per cent would be about three to two.

"*J. H. Pearson*: Am a miner. Have had about seven years' experience with giant powder. The higher the grade of powder the easier it is exploded. I was working right by the side of Chambers when he was hurt. B. Sutton was ground boss. Nothing was said to me of any change of powder. Was with Chambers all that morning. Nothing was said to him in my presence; forty per cent powder was given us. I was cutting the powder and Chambers was putting it in the hole. I prepared it and handed it to him. He used a gas pipe tamping bar. We were taking most of the wrapper off the powder, all but just enough to cover the powder, and putting it down in the hole, and pushing it down with the tamping bar. It just went off, that is all I know. We had miners' lamps fastened in our hats. I never paid any attention to the grade of powder we were using until after the accident, in the afternoon. Found it was forty per cent. Saw Mr. Sutton. He stated he did not see any difference in the powder.

"Cross-examination: I found out it was forty per cent powder by looking at it; by looking at the sticks; it stated forty per cent powder, branded on each stick in good size letters; plain, only necessary to look at it in order to understand what it was. The light we had was like all miners use in working in the mines. Just before the accident Mr. Chambers said something about his hole choking up. I think the powder caught in the hole. He was pushing like he was trying to remove some obstruction. Metal where you are working it up and down on flint rock is liable to strike a spark and the spark is liable to explode the powder. It takes a pretty hard blow to explode powder. They do use as high as sixty-five per cent

powder in that district.    Most of the companies in the
Center Valley and Oronogo use forty per cent powder.
It is almost impossible to tell what causes powder ex-
plosions.    Powder is dangerous and uncertain.

"*Alfred Emery*:   Have been mining about eight
years.   Was working in mine with Chambers about
two months before accident.   We had been furnished
with twenty-seven per cent powder; on the morning
Chambers was hurt we were furnished with forty per
cent.   I discovered this about five minutes before he
was hurt.   I was loading a hole and noticed the differ-
ence in the grade of powder myself.   Had not been
informed of it.    Mr. Sutton was ground boss.    He
told me that evening we were using forty per cent
powder.   He did not state where he got it.   I just hap-
pened to discover it there in the dark.

"Cross-examination:   Am brother-in-law of Mr.
Chambers.   I found out it was forty per cent powder
by the print on it.   Printed forty per cent.   It is not
plain letters, a man ain't use to powder and had some
experience, ain't apt to notice it.   There is a trade-
mark on the forty per cent; I don't remember what it
says.

"*T. N. Brock*:   Had been working in the Hawkeye
Mine about six or eight weeks.   We had been furnished
twenty-seven per cent powder.   On the morning of the
accident we were furnished with forty per cent.   Had
not been notified by anybody of the change in the pow-
der.   B. Sutton was ground boss.   Late that evening
after taking Chambers home he said he should have
notified the men of the change of powder but had for-
gotten it.   He seemed to feel very sorry about it.   Forty
per cent powder will explode easier than twenty-seven
per cent.

"*Jos. Higenbotham*:   Was at work fifty or sixty
feet from Chambers at the time of the accident.   I
went to work some time in January, this accident hap-
pened in March.   We had been using twenty-seven
per cent powder I think previous to the accident.

"Cross-examination: Do not know when they commenced using forty per cent powder. I found out this was forty per cent powder by looking at the powder; I believe the grade was on the stick, if not it was on the box. Sometimes it is on the box, sometimes on the stick. Forty per cent takes less of a blow to explode it than twenty-seven per cent. From what I have seen the grade used around there runs from twenty-seven to forty per cent. I have seen sixty-five per cent used.

"*George Bartholomew*: Was ground boss in the mine in December, January and part of February previous to the accident to Chambers. We used a low grade of powder, anything below forty per cent, excepting five boxes. Chambers was working there then. A short time before I quit we used five boxes of Columbian powder, then changed back to the low grade powder. The Columbian powder was an experiment. The higher the grade of powder the more dangerous it is.

"*Mrs. Belle Emery*: Describes condition of Chambers after accident; plaintiff's sister-in-law.

"*Fred. Richardson*: Examined as an expert. Nothing developed.

"*Richard Johnson*: Working near Chambers. We used two or three different kinds of powder before the accident. We used Aetna, twenty-seven per cent, and Columbian. I don't think any directions or notice was given when we changed to Columbian. When the change to forty per cent was made there had been notice given to that effect a few days before the accident, I could not say as to whether it was given on the day of the accident. I have been used to handling a forty per cent powder. Used it all my life. All the mining I ever did almost was with forty per cent powder. I don't know that I handled it any carefuller than twenty-seven per cent powder. I think they went back to a low grade powder before the accident.

"Cross-examination: There was a notice five or

six days before the accident of the change from twenty-seven per cent to forty per cent; we used this higher grade four or five days before the accident; forty per cent powder is generally used. It is considered a generally safe powder. We used the same method in handling one as the other. Have to be careful with all, all are dangerous and apt to explode. If I was using seventy-five per cent powder, which I have used, I would be careful. Forty per cent is considered a perfectly safe grade. I have handled it with as much safety as twenty-seven per cent. I think the first time we made the change to forty per cent we all knew about it, that was five or six days before. We were all notified. We used forty per cent on down to the time of the accident. I don't know whether the percentage is branded on it or not. We noticed an animal on one and did not see it on the other. I remember several of us were looking at the brands on the label and couldn't distinguish which was forty per cent. I don't remember the brand on the Aetna, only this high grade.

"*Dr. D. V. Wale*: Examined as to plaintiff's condition. Testifies eyesight is destroyed.

"*Enoch Purcell*: Expert. Giant powder containing forty per cent nitroglycerine is more sensitive to force than that containing twenty-seven per cent, a difference of one-third to one-half. I have seen this powder burn. Have picked up stick that was blazing and threw it over the dump. It is force that explodes powder. It is the jar.

"Cross-examination: Chambers and I married cousins. The powder I burned and threw was fifty per cent; American Forcite powder. Never had any experience with powder and fire where powder was confined."

Inasmuch as other questions in the case necessitate a reference to the whole case, the abstract of the evidence for the defendant made by defendant's counsel is also adopted, which is as follows:

Defendant's Testimony.

"*V. L. Chester*:   One of defendants. I saw Chambers after the accident, something like two weeks after the accident.   I was inquiring of him how he accounted for the accident, and he says:   'Well Doc, that is something I can't account for.'   He says:   'It was dinner time, and I guess I must have got in a little too big a hurry and punched the powder too hard.   That is the only way I can account for it.'   Afterwards, about ten days or two weeks, I saw him again and he referred to the matter again, and said the same thing.   He said there wasn't anybody to blame about the matter, only himself.

"*Dr. Olive*:   One of defendants; saw Chambers at his house next morning, right after the accident; I stepped up and shook hands with him, he was in bed, and I told him I felt sorry for him, and asked him how the accident occurred. He said that it occurred through his own carelessness; he said that he had loaded a hole and put in fifty-five sticks of powder, and was putting in the last stick.   He said that it was just at noon and he got in a little two big a hurry, he thought, and in shoving the stick in the hole he said that he thought there was a little piece of rock got down between the hole and the stick; he also said that he had stripped the powder, and he thought that rock grating on the bare powder caused the explosion.   He said he would never strip another stick of powder as long as he lived. I never said anything to him about a change of powder; I never knew anything about that; have nothing to do with the practical operation of the mine.

"Cross-examination:   Never told Chambers anything about change of powder; had a talk with Bartholomew about Columbian powder; he said he considered it dangerous; I wanted to reduce the amount of the powder bill; I did not know anything about the grade; we dropped the Columbian powder because we considered it dangerous.

"*J. E. Bell*: One of defendants; was superintendent of the mine at the time in question; I bought the powder; we last commenced to use forty per cent powder on the 13th of March; I have the invoice here the day the powder was bought; this was No. 2, forty per cent; we used this from March 13th down, and no other; I had a talk with Chambers about a week after the accident at his house; he said it was one of those accidents that happen; wasn't any one to blame for it; couldn't tell how it happened; said that dinner had been called; he didn't know he was loading any different from what he always had; he might have given a little harder push than he was thinking for.

"*Earl Peebles*: Business, mining; the powder I have seen used most in this district is powder marked forty per cent nitroglycerine; there is no difference in the method used in cleaning and loading and shooting holes with forty per cent powder and with lower grades; I never found any difference in the degree of danger in using them; I think sometimes the twenty-seven per cent is more liable to explode than the forty per cent because it is poorer mixed.

"Cross-examination: Never had any practical experience as a miner. My experience is principally overseeing mines.

"*John Dermott*: Been mining last five or six years; believe there is more forty per cent powder used in this district than any other. Where the ground is not hard a lower grade is used. I would say that forty per cent is perhaps most commonly used.

"Cross-examination: Have always had a mine boss. Never loaded a hole myself.

"*A. E. Spencer*: Attorney; on April 1, 1899, I visited Mr. Chambers, the plaintiff, at his house. I asked him, or told him, I wanted to get a statement of how the accident occurred. I sat down at a little table in the room. He sat, I think, on the bed. We talked it over and he told me how it occurred, and I wrote down as he talked until I thought I had covered the field. I then read to him very distinctly and very

plainly and carefully what I had written.    He said that that was right, then affixed his signature to it.   I was a notary public and he swore to it before me.   I attached my signature as a notary public; I still have that document and produce it here now.   Mr. Chamber's name was signed there in my presence; what I wrote there is what he told me.

"Cross-examination:   Q.   At whose instance did you go there, Mr. Spencer?   (Objected to as immaterial and incompetent; objection overruled, exception noted.)   A.   A company operating in this district, known as the Union Casualty and Surety Co.   Plaintiff could not see at the time he signed this.   I told him I came at the request of the insurance company. There were one or two ladies there when I went in; as we talked my recollection is the ladies left the room. My object was not to get a favorable or an unfavorable statement, but the facts concerning the accident. It did not make a particle of difference to me whether they were good or bad.   He did not tell me that he learned after the accident that they were using forty per cent powder.   I asked him what kind of powder they were using and he said forty per cent powder. I took Mr. Pearson's statement the same day.

"*Plaintiff's Statement*:   S. E. Chambers, being duly sworn, on his oath says:   'On Monday, March 20, 1899, I was in the employ of the Hawkeye Mining Company, at Center Valley, Jasper county, as a cutter in the ground.   About ten-thirty o'clock in the forenoon of March 20, 1899, John H. Pearson and I went to the face of one of the drifts to load a hole there, D. Sutton, the ground boss, told us to load the two holes already drilled, so we could shoot before we went out to dinner.   These two holes were right next to the face of the drift, in the top of the stope.   He did not give us any further orders about the work.   We loaded one hole and about half-past eleven o'clock we commenced to load the second hole.   This latter hole was drilled straight in the face of the stope.   Almost level. It was about five and one-half to six feet deep.   It had

been drilled a day or two before, and had been squibbed. We squibbed it once with about ten or eleven sticks of powder, about ten or ten-thirty o'clock, the morning of March 20. Then Pearson cleaned it out, and I went and loaded another hole up in the face. It was tolerable hard ground. Real hard flint ground. We commenced to load the last hole about half-past eleven o'clock that morning. They called for dinner just about the time the powder exploded. I did not think till then it was dinner time, and was not rushing my work. I thought I had plenty of time. It was a nice smooth hole. I loaded the hole, and Pearson handed me the powder. We stripped the powder, leaving just one wrap of paper, and the hole was nice and smooth and sloped down a little, and the powder went down easy. We [were] loading with whole sticks of powder. Would start a stick in with my hands, and then push it down with the tamping bar. The tamping bar was all gas pipe about five-eighths or three-fourths, with a wooden plug driven in the end that went in the hole. The plug did not stick out past the pipe any. The usual way to fix these bars is to drive a wooden plug in and cut it off even with the end of pipe. These plugs are safer than iron tamping bars—they are lighter and have less metal at end. We were using forty per cent Aetna powder—it is all right to use. The sticks all went down easily—there was a pocket at end of hole—except the last stick—about the fifty-fifth stick, and it stuck in the hole just above the pocket. It did not stick bad, I just pushed a little and it went in, but the powder was rather gummy, and some of it was left sticking on the sides of the hole. The hole was open, for the bar went down in the pocket, but with the bar I could feel some of the powder from the last stick gummed to sides of the hole where it would interfere with the next stick. Then I stooped over with my face in front of the hole trying to see in, and took the bar and scraped up and down the sides of the hole to get the gummed powder off. Think I had the hole about cleaned when the pow-

der exploded, injuring me. The shot was not in the hole yet. Pearson handed me the powder when I squibbed this hole. We did not squib the other hole in the stope. The hole had plenty of time to cool, I thought. We never did wait on a hole in that ground over ten or fifteen minutes. I can't hardly imagine what caused the explosion. The only theory that looks reasonable to me is that in scraping the powder off the hole the bar struck a spark and set off the powder. I was not hitting the powder at all when it went off—once in a great many times a spark will set off the powder. It seemed like it just took a notion and went off, but of course there was some cause.' ''

The abstract of the evidence for the plaintiff in rebuttal, made by counsel for defendants, is also adopted, which is as follows:

**Plaintiff's Rebuttal.**

"*Mrs. Emery:* Recollect circumstance of Dr. Olive being at Chambers' and asking how he got hurt. Mr. Chambers did not say to him that he did not know how it occurred, unless it was through his carelessness; that he had about fifty-five sticks of powder in and that it was near noon, and he was in a hurry; was shoving a stick in the hole, and that a little piece of rock grated down between the bar and the powder and caused the explosion, and that he would never strip another stick of powder as long as he lived. Chambers made the remark he was careful, and he didn't see how he could be more careful than what he was. He said he didn't think it was carelessness on his part.

"Cross-examination: I was in and out, working about. I don't know what was said when I was out.

"*S. E. Chambers:* I did not say to Dr. Olive or Mr. Bell or Mr. Chester that I did not know how the accident occurred unless it was my own carelessness, nor to anybody. I never said a word about a stone getting fastened in the hole, because no stone ever got fast or in the way of the powder. In the statement read by Mr. Spencer I did not understand that there

was anything in it about forty per cent powder being used, and that it was all right to be used. There was not a word about powder in what he read to me. Powder was never mentioned. I stated what questions he asked me; I did not undertake to state anything, only answering the questions he asked me. I learned about five minutes after the accident that it was forty per cent powder; some one said it, don't know who.''

The instructions complained of will be considered in the course of the opinion.

## I.

The first question presented for decision is the refusal of the court to direct a verdict for the defendants at the close of the plaintiff's case.

In support of this contention the defendants assign four reasons, to-wit: ''1. Notice of grade of powder, both general and special—by printed notice on each stick of powder supplied, was given. 2. If not it was immaterial, as the plaintiff does not pretend that he would have proceeded in any different manner than he did, or that he could have used any greater care than he did. 3. There is no evidence that the same accident would not have occurred had plaintiff been using twenty-seven per cent nitroglycerine instead of forty per cent. A verdict must not be based on a mere conjecture. 4. The injury was one of the risks of the hazardous occupation in which he was engaged, which was assumed by the plaintiff.''

The plaintiff testified that he had used twenty-seven per cent giant powder all the time he worked for the defendants, except on three days, to-wit, six or seven weeks before the accident, when a higher grade was used for two days, and they did not like it and went back to the twenty-seven per cent, and again about two weeks before the accident, when forty per cent powder was used for one day and they then returned to the use of twenty-seven per cent powder, and that at the time of the accident he supposed they were using

twenty-seven per cent powder. He also testified that the higher the grade of powder, the easier it is to explode, and that the force necessary to explode twenty-seven per cent and forty per cent powder would be about three to two. There was evidence for the plaintiff that the men were not notified that a change was made and that the powder which was being furnished was forty per cent powder, and not twenty-seven per cent powder. Some of the men discovered just before the plaintiff was hurt that the powder was forty per cent powder, but it is nowhere shown that the plaintiff knew that fact or that any one told him. The sticks of dynamite had labels on them showing their strength, but the evidence is conflicting as to whether those labels were plain and prominent enough to attract attention or were only sufficient to disclose their strength when the labels were closely examined. It does not appear that the plaintiff ever saw the labels, but it does appear that his helper took off all but the inside wrapper from the sticks of powder, and handed them to the plaintiff, who put them in the hole, and that even the helper did not know until after the accident that they were using forty per cent powder.

So that it was a question of fact for the jury to decide, whether the plaintiff had general notice of the change in the character of the powder that was being used, and also whether the labels on the powder were of such size and character as to be so easily discerned by the plaintiff, that a failure to do so constituted negligence on the plaintiff's part. In this connection it was the province of the jury in determining this question to consider the manner in which the plaintiff was doing the work, that is, the fact that he did not handle the powder until his helper had removed the outer wrapper to which the labels were attached, and therefore when the powder reached the plaintiff's hands there was no label on it, and also to consider whether the defendants did or did not know that this was the manner in which the work was done. These facts certainly furnished some substantial evidence that the plaintiff did not

know that forty per cent powder was being used, and afforded sufficient basis for the jury to find that whether the forty per cent powder had been in use for a week before the accident, as the defendants claimed, or not, the plaintiff had no knowledge or notice, express or implied, of any such change. This being true the trial court could not for this reason take the case from the jury.

The second sub-contention under this assignment of error, that it is immaterial whether or not the plaintiff had express or implied notice of such change in the strength of the powder, inasmuch as he does not pretend that if he had known it he would have proceeded differently from the way he did or that he could have used any greater care, is also untenable. The testimony shows that the plaintiff knew that higher grades of powder explode more easily than lower grades, and that he had used higher grades without injury when he knew that he was using the higher grade and therefore knew how much care it was necessary to employ to prevent an explosion. It is true that the plaintiff says he was exercising care and not using unnecessary force, but it must be observed that his testimony in this respect must be taken and understood as referring to such care as he believed, and from long experience had a right to believe, was sufficient to avoid an explosion when twenty-seven per cent powder was being used, and can not fairly be treated as having any reference to the care necessary and proper to be employed when forty per cent powder was being used.

The third sub-contention under this assignment of error is that there is no evidence that the explosion would not have occurred if twenty-seven per cent powder had been used instead of forty per cent powder. But when it is remembered that the plaintiff's evidence showed that he had used both kinds without injury when he knew what he was using, it can not be said in the absence of any counter showing, and there is

Vol 172 mo—31.

none in this case, that this is not of itself a sufficient circumstance from which the jury would be justified in deducing the fact that if the plaintiff had known he was dealing with a more dangerous agency he would not have even attempted to scrape the dynamite from off the sides of the hole where it had stuck, and therefore the explosion would not have occurred. This is not mere conjecture. It is an inference that may fairly be drawn from the given facts and experiences and conduct and acts of the parties in the past. Aside from all this, does not this contention rest as much upon conjecture as the defendant's assertion that the plaintiff's case does? Is it not more of a conjecture to say that a smaller charge of giant powder or a lower grade of such powder will explode as easily as a higher grade? Such is the logic of this contention, and it is not such as to carry conviction even to the mind of a layman. Prima facie the converse is true, and the testimony shows that the converse is true. At any rate the plaintiff was entitled to know that the old method of doing business was changed and that he was thereafter to deal with a more dangerous instrument. When the prior changes had been made he had been notified of them. For what purpose, if the same risks were incident to the use of the lesser strength of the powder that attended the use of the stronger powder? These considerations naturally lead to the conclusion that there was some substantial evidence from which the jury would be justified in inferring that the explosion would not have occurred if the plaintiff had had notice that forty per cent powder had been substituted for twenty-seven per cent powder. And this being true the court could not, for this reason, take the case away from the jury.

The fourth sub-contention under this assignment of error is, that the injury was caused by one of the risks of the hazardous occupation the plaintiff was engaged in, and was assumed by the plaintiff when he entered the employment.

It is true that the business was a hazardous one, but for this very reason all persons engaged in it owed a duty to all other persons to be careful. The servant in entering upon such a business assumed all the risks. that are ordinarily and necessarily incident to the business, but, on the other hand, he did not assume and agree to bear all the extraordinary and unusual risks that might be caused by the misconduct and negligence of the master, or, as in this case, of the master's *alter ego*. Because a higher grade of powder is more dangerous than a lower grade, and therefore requires more care in handling it, and because on every prior occasion when a higher grade was used the servants were given timely notice thereof, the master owed the servant the duty to notify him that a higher grade was then being furnished him to use, and the servant had a right to rely upon it that the master would so notify him. The evidence shows that powder of forty, fifty and even sixty-five per cent has been used in other mines without resulting in injury to anyone, but this fact is not a determining factor in this case, because it is not shown, and prima facie is not the fact, that it was used without notice to the servants of its character. For it is idle to expect any one to believe that masters generally would be so negligent and indifferent to the lives of their servants.

However, in support of the contention in this regard the defendants cite only the case of King v. Morgan, 109 Fed. 446, wherein the opinion of the United States Circuit Court of Appeals was written by ADAMS, District Judge, and concurred in by SANBORN, Circuit Judge; CALDWELL, Circuit Judge, dissenting.

It requires only a statement of the facts in judgment in that case to demonstrate that it affords no basis for the contention of the defendants in this case. In that case the sole ground of negligence charged and relied on by the plaintiff was that the defendants furnished him unsuitable appliances with which to do their work, to-wit, a tamping bar, made of inch gas pipe,

with the end plugged up with wood or clay. The plaintiff in this case assigned similar negligence but abandoned it on the trial and the court took that charge away from the jury in this case.

In the King case the learned judge who delivered the opinion, pointed out the fact that the plaintiff in that case was intelligent, well educated and experienced, and that he knew what appliances were necessary and safe, and had abundant opportunity, if he did not think the tamping bar that the master furnished him was safe or proper, to object to its use; and if it was patently unsafe, to quit the service if after notice the master persisted in using it, and for these reasons it was held in that case that the plaintiff was not entitled to recover. That case is very different from this case. There the servant saw and knew exactly the nature and character of the tamping bar, while here the plaintiff did not know that he was using a more dangerous instrument than he had been using, and such an instrument as when used on prior occasions he had been specially notified was to be used. But it would be an injustice to the great learning of the judge who wrote the opinion in the King case to believe that under the facts in this case he would have thought that the principles of law so ably announced in that case, would cut off the plaintiff's recovery in this case.

This case finds a close parallel in the case of Smith v. Oxford Iron Co., 42 N. J. L. 467. There, too, the plaintiff, a miner, lost his eyes by an explosion of giant powder. There the negligence charged was introducing a new explosive without notice to the servant of the fact, without instructing him as to its use or advising him fully of its dangerous character. There, too, the plaintiff recovered in the lower court and the case came before the Supreme Court. After a very exhaustive review of the cases bearing upon the duty of masters to their servants to furnish them safe and suitable appliances, the court concluded as follows:

"While the master is not held as guaranteeing the

absolute safety of machinery or appliances provided
for his employees, or the fitness of co-servants, he is
bound to observe such care as the exigencies of the
situation reasonably require in selecting them.  Any
injury resulting to a co-servant from the failure of the
company positively to perform this duty, is actionable.

"When the plaintiff engaged in the service of the
defendant, the ordinary blasting powder was used, and,
under his contract with the company to labor as a
miner, he assumed the risk of personal injury, in blast-
ing with the ordinary agency used for that purpose.
He did not agree to subject himself to the hazard at-
tending the use of an unusual and highly-explosive sub-
stance, of the dangerous quality of which, as well as
of the proper manner of applying it, he was wholly
ignorant.  It appears that Selden T. Scranton, the
president of the defendant company, to whose care was
committed the superintendence of the business of the
corporation, in April, 1874, introduced the use of giant
powder.  It is clearly shown that it was a highly-dan-
gerous explosive, and that the proper manner of using
it was not made known to the plaintiff, although printed
instructions were in the possession of the company.
Before allowing this new compound to be introduced
it was a duty which the company owed to the plaintiff
to ascertain and make known its properties and the
mode of using it, either to the plaintiff himself or those
under whose direction he worked.  The obligation to
do so rested upon Scranton, as the head officer of the
company, and his neglect in that respect was the neg-
lect of the company itself.  It was gross negligence
in the company to furnish such an article for a lab-
orer's use without giving him the requisite informa-
tion.  Whether the company was aware of its danger-
ous quality, or furnished it for use without having
taken steps to obtain such knowledge, it is equally lia-
ble.  It was a duty which the company, through Scran-
ton, was bound to perform, to see that such reasonable
care as the exigency of the case demanded, was taken,

and to impart to the subordinates full information as to the manner of applying the new compound, before placing it in the hands of an ignorant laborer.

"This obligation resting on the company itself, the president could not shift their liability by referring the matter to one of his subordinates. The effect of such a rule would be to substantially absolve a corporation from all liability.

"There was a clear failure on the part of the president to use the care which, under the circumstances of the case, the law exacted from the defendant, and his neglect must be imputed to the company."

In that case the plaintiff had been using ordinary blasting powder, and the master introduced a new kind of an explosive (giant powder), without notice to the servant of the change, whilst here the same kind of an explosive was used, but of a more dangerous character. In both instances the employee supposed he was using the kind he had theretofore used with safety. The difference between that case and this is a slight difference of fact only; the legal principles there decided apply with full force to this case as well as they did to that, and lead to the same conclusion.

## II.

The defendants next assign as error the first, second, and third instructions given for the plaintiff, which were as follows:

"1. The court instructs the jury that if they find from the evidence, that on the 20th day of March, 1899, the defendants were partners engaged in operating a mine under the firm name of the Hawkeye Mine, and that plaintiff was in defendants' employ in said mine, as a cutter in the drift of defendants' mine, and that the plaintiff had previously been furnished by defendants with giant powder containing twenty-seven per cent only of nitroglycerine, and that on said day, while plaintiff was so in defendants' employ, the defendants furnished to plaintiff giant powder containing forty

per cent of nitroglycerine, and if you find from the evidence, that giant powder containing forty per cent of nitroglycerine requires greater care in its use and was more easily exploded, and was more dangerous to handle in blasting than powder containing only twenty-seven per cent of nitroglycerine, then it was the duty of the defendants, on changing said powder, to notify plaintiff of the increased hazard he was taking in the use of said higher grade of giant powder, and if the jury find that the defendants negligently failed to notify plaintiff of said increased hazard, and plaintiff not knowing of said change in the powder so furnished and which he was then using, while attempting to charge said drill hole and placing said giant powder in said drill hole with a gas pipe, furnished by defendants for plaintiff's use for that purpose, and while plaintiff was in the exercise of that degree of care and prudence which an ordinarily prudent man engaged in the same line of business would ordinarily exercise in charging said drill hole with giant powder containing twenty-seven per cent of nitroglycerine, the said giant powder was exploded, and the said explosion was occasioned on account of the use of the said higher grade of explosive, and on account of the want of knowledge on behalf of the plaintiff of the high character of said explosive, and the want of knowledge on his part of the increased degree of care required of him to prevent such explosion, and that plaintiff was injured by said explosion, then you will find the issues in favor of the plaintiff.

"2.   The court instructs the jury that if they find from the evidence, that D. Sutton was defendants' ground foreman, and had charge of defendants' employees working under ground in defendants' mine, and had direction of the work under ground, and that said foreman, while so in charge of said employees and said work for defendants, failed and neglected to notify plaintiff of the change of the grade of powder furnished him, if you find from the evidence that the grade of powder was changed, and that said ground boss

failed to notify plaintiff thereof, then the negligence of said foreman in so failing, would be the negligence of the defendants.

"3.    The court instructs the jury that, if they find from the evidence that previous to the injury of plaintiff the defendants had furnished for his use in blasting, powder containing only twenty-seven per cent of nitroglycerine, and that on the day of said injury defendants furnished to him giant powder containing forty per cent of nitroglycerine, and if you find that powder containing said increased per cent of nitroglycerine was more hazardous and required greater care in its use, and that the same was furnished to plaintiff by defendants without informing plaintiff of the higher grade of explosive, and that plaintiff did not know that a higher grade of explosive was furnished, and being used by him, but supposed that the explosive furnished contained only twenty-seven per cent of nitroglycerine, then plaintiff, as the servant of defendants, did not assume in entering into defendants' employ, the increased risks attending upon such change of the grade of the explosive, unless he was first notified or knew of such change."

To properly appreciate the force of the criticisms leveled at these instructions it is necessary to set out the following instruction which was asked by the defendants, and modified by the court by striking out the words in brackets and in italics (as to which the defendants make no point) and then given by the court:

"Unless you believe from the evidence that defendants changed the grade of powder used by plaintiff in their mine from twenty-seven per cent powder to forty per cent powder without plaintiff's knowledge and he remained ignorant thereof, and that said forty per cent powder will explode from a lighter blow or use of substantially less force than twenty-seven per cent powder and requires a higher degree of care in the handling [*and that said forty per cent powder is rarely used in the mines of the district where plaintiff*

*was working*] and that said change substantially in-creased the danger to plaintiff in working in said mine, and that the change of said powder from twenty-seven per cent to forty per cent was the direct and proximate cause of plaintiff's injuries, and that no negligence or want of ordinary care on the part of the plaintiff in any way contributed thereto, your verdict must be for defendants.''

The court, at defendants' request, further in-structed the jury that the defendants had a right to use any grade of powder they saw fit, and that if the plaintiff knew he was using forty per cent powder, he could not recover; and further that if the plaintiff was using dangerous agencies it was his duty to use rea-sonable care to avoid injury, and if he failed to do so he could not recover.

These instructions taken as a whole show the theory upon which both parties tried the case in the lower court, and that theory is in strict conformity to the principles of law hereinbefore declared to be appli-cable to and decisive of a case of this character.

The criticisms of these instructions are that the first instruction makes it the duty of the defendants to inform the plaintiff of the increased hazards irrespec-tive of his knowledge or opportunity of knowledge; that it assumes a controverted fact, i. e., plaintiff's ignor-ance of the grade of powder he was using; that it as-sumes plaintiff was exercising ordinary care; that it contains misstatements of facts and has meaningless and confusing clauses and is not predicated upon the evidence; that the second instruction entitles the plain-tiff to recover if Sutton, the foreman, did not notify the plaintiff of the change in the dynamite, notwithstand-ing the plaintiff might have known that fact or have been informed by some other officer or agent of the company; and that the third instruction authorizes a recovery by the plaintiff if he was ignorant of the grade of the powder, notwithstanding that ignorance may have been due to his own negligence.

Without a critical analysis of all these objections, and even if it be conceded, which could not properly be done, that all the criticisms are well founded, nevertheless the defendants' instruction above set out covered the whole case and cured whatever, if any, objections that could be raised to the plaintiff's instructions criticised, and under the defendants' instruction, and in truth under the instructions taken as a whole, the law was properly declared, and the plaintiff was entitled to recover, if the jury believed the case as made for the plaintiff. But the criticisms of the plaintiff's instructions are not well founded. They do not require the defendants to notify the plaintiff irrespective of his knowledge or opportunity of knowledge, nor do they assume that plaintiff was ignorant of the character of the powder, nor that he was exercising ordinary care, nor are they devoid of fact upon which to rest, nor do they misstate the facts as shown by the plaintiff; nor does the second instruction authorize a recovery by the plaintiff notwithstanding he knew of the change of dynamite if Sutton failed to notify him, but that instruction simply tells the jury that the failure of the *alter ego* to do his duty is negligence of the defendants, which will, of course, be conceded by every one to be correct law; nor does the third instruction permit plaintiff to recover notwithstanding he was guilty of contributory negligence, but this instruction, taken in connection with defendants' instruction, quoted, which told the jury, "and that no negligence or want of ordinary care on the part of the plaintiff in any way contributed thereto," sufficiently instructed the jury on the question covered by these instructions and upon the question of contributory negligence.

## III.

Permitting the plaintiff to testify that he was a married man, is next assigned as error.

If this be true, then the record is full of similar errors, some of them clearly invited by the defendants, for all through the case, the witnesses on both sides without objection spoke of and referred to the fact that the plaintiff was a married man. So that if the court erred in this regard, the fact appeared elsewhere in the testimony and was not objected to by either party.

The ruling, therefore, does not constitute reversible error, even if it be error, which it is unnecessary now to decide.

For these reasons the judgment of the circuit court is affirmed. All concur, except *Robinson, J.,* who dissents.